07 CV 11124

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
PROBO BISON SHIPPING INC.,                    :    07 Civ. _____
                                              :
                    Plaintiff,                :
                                              :    ECF CASE
      - against -                             :
                                              :
EMIRATES SHIP INVESTMENT COMPANY LLC,         :
                                              :        DEC 1 0 2007
                    Defendant.                :
-------------------------------------------------------------X

## VERIFIED COMPLAINT

Plaintiff, PROBO BISON SHIPPING LTD. ("Plaintiff") by and through its attorneys,

Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against the Defendant,

EMIRATES SHIP INVESTMENT COMPANY LLC ("Defendant"), alleges, upon information

and belief, as follows:

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the

breach of maritime contract of charter. This matter also arises under the Court's federal question

jurisdiction within the meaning of 28 United States § 1331 and the New York Convention on the

Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201 *et seq.*) and/or the

Federal Arbitration Act (9 U.S.C. § 1 *et seq.*).

2.      At all times material to this action, Plaintiff was, and still is, a foreign

company duly organized and operating under foreign law.

3.      Upon information and belief, Defendant was, and still is, a foreign corporation, or

other business entity organized and existing under foreign law with a principal place of business

at Al Neem Tower, 4th Floor, Khalifa Street, Abu Dhabi, United Arab Emirates.

4. At all material times Plaintiff was the Owner of the ocean going motor vessel "PROBO BISON" (hereinafter the "Vessel").

5. Pursuant to a charter party dated May 21, 2004, Plaintiff chartered the Vessel to Defendant[1] for a period of two years, 30 days more or less in Defendant's option and a further one year in Defendant's option to be declared by Defendant four months prior to expiration of second year (Clause 4). A copy of the charter party is annexed hereto as Exhibit 1.

6. Upon information and belief, Defendant sub-chartered the Vessel to non-party ST Shipping ("ST") effectively on terms that were "back to back" to the May 21, 2004 charter party between Plaintiff and Defendant. ST carried out the commercial and management operations of the Vessel on behalf of Defendant.

7. Upon information and belief, ST Shipping sub-chartered the Vessel to non-party Team Tankers A/S ("TT") on voyage charter party terms (i.e., for a single voyage) and in turn, TT further sub-chartered the Vessel on voyage charter party terms to non-party Tricon Energy Ltd. ("Tricon").

8. As Vessel charterer Tricon issued instructions to the Vessel to proceed to South Korea to load a cargo of up to 50% liquid caustic cargo for carriage to the United States with intended discharge ports on the U.S. East Coast in May 2006.

9. Liquid caustic cargo is a highly sensitive cargo the carriage of which requires a modern vessel with stainless steel cargo tanks that have been properly prepared and cleaned prior to loading. In the event that the intended vessel is not equipped with stainless steel cargo tanks, as was the case of the subject Vessel, then the cargo tanks must be epoxy painted with paint

---

[1] Defendant was formerly named Combined Cargo UAE LLC but changed its name to Emirates Ship Investment Co. LLC as reflected in Addendum 1 to the charter party dated March 3, 2005.

coatings inspected and deemed to be in acceptable condition to load the cargo without causing contamination during the voyage.

10.    . When Tricon issued its voyage instructions to the Vessel she had been operated by Defendant for approximately two years. The condition of her cargo tanks epoxy coatings was well known to the Defendant and its manager – non-party ST – as a result of their operation of the Vessel during the prior two years and also as they had specifically requested from the Vessel Master the condition of the cargo tanks coatings. The Vessel Master supplied a full report, including copies of the Vessel's Structural Condition Reports dated December 2005 for all of the vessel's cargo tanks prior to the loading of any liquid caustic cargo at Korea.

11.    Defendant requested and Plaintiff provided a plan for tank cleaning which was agreed by the Defendant.

12.    Defendant sought from Plaintiff a guarantee that the intended liquid caustic cargo would have less than 5 parts per million of iron ore residue if loaded into, and carried within, the Vessel's cargo tanks after the proposed tanks cleaning but Plaintiff did not provide the requested guarantee. A copy of the relevant email communication dated May 10, 2006 is attached hereto Exhibit 2.

13.    Defendant proceeded to accept the tank cleaning proposal and thereafter the tanks . were cleaned, inspected by professional inspectors who approved the same for loading, and was accepted by the Defendant without further comment.

14.    Tricon's cargo was thereafter loaded at Yeosu, Korea into the Vessel's tanks and the Vessel departed Korea for her intended discharge ports on the U.S. East Coast.

15.    Upon arrival at the discharge ports the cargo was subject to sampling prior to . discharge and found to be contaminated with iron residue in excess of 5 parts per million.

3

16.    Tricon sued Plaintiff in the U.S. District Court for the Southern District of Georgia – Savannah Division (File No. CV406-170) for breach of the bills of lading covering the cargo seeking to recover the damage sustained to its cargo and its related costs and expenses incurred in the storage, sampling, discharge and salvage of the cargo.

17.    Plaintiff settled Tricon's lawsuit in July 2007 for $895,000 and has satisfied this settlement by payment to Tricon.

18.    Plaintiff's liability to Tricon was the direct and proximate result of Defendant's breach of the May 21, 2004 charter party, and in particular, clauses 3(i) and (iii), 13 and 52 thereof, for which Plaintiff seeks indemnity for its $895,000 payment to Tricon plus interest, arbitration costs and attorney's fees.

19.    Despite due demand, Defendant has failed to indemnify Plaintiff the $895,000 paid to Tricon.

20.    Pursuant to charter party clauses 41 and 82, all disputes arising thereunder are to be determined in accordance with English law and decided by the English Courts although either party is also vested with the right, without prejudice to the right to arrest or maintain under arrest any maritime property, to have any dispute referred to arbitration in London pursuant to the Arbitration Act of 1996, or any statutory modification of re-enactment thereof for the time being in force.

21.    Plaintiff is preparing to commence litigation against Defendant in the English Courts and reserves its right to have the subject dispute referred to arbitration. A copy of Plaintiff's arbitration notice is attached hereto Exhibit 3.

22.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party in litigation in the English Courts conducted pursuant to English law and/or arbitration conducted

4

pursuant to the Arbitration Act of 1996. As best as can now be estimated, Plaintiff expects to recover the following amounts:

| | | |
|---|---|---|
| A. | Principal claim: | $895,000; |
| B. | Estimated interest on claims:<br>[3 years at 7.5% - compounded quarterly] | $223,723.88; |
| C. | Estimated attorneys' fees: | $150,000; and |
| D. | Estimated litigation/arbitration costs and expenses: | $75,000. |
| **Total:** | | **$1,343,723.88.** |

23.     The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of one or more garnishees which are believed to be due and owing to the Defendant.

24.     The Plaintiff seeks an order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendant held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendant, to compel arbitration (if necessary) and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.    That the Court retain jurisdiction to compel the Defendant to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*

C.    That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds held by any garnishee within the District which are due and owing to the Defendant, in the amount of **$1,343,723.88** calculated to date to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

D.    That this Court recognize and confirm any London arbitration award(s) or English Court judgment(s) rendered on the claims set forth herein as a Judgment of this Court;

E.    That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

F.    That this Court award Plaintiff its attorneys' fees and costs of this action; and

G.    That the Plaintiff has such other, further and different relief as the Court may deem just and proper.

6

Dated: December 10, 2007
New York, NY

The Plaintiff,
PROBO BISON SHIPPING INC.

By:

Kevin J. Lennon
Patrick F. Lennon
LENNON, MURPHY & LENNON, LLC
The Gray Bar Building
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 – phone
(212) 490-6070 – fax
kjl@lenmur.com
pfl@lenmur.com

## ATTORNEY'S VERIFICATION

State of Connecticut )
                )    ss.:    Southport
County of Fairfield )

1.    My name is Kevin J. Lennon.

2.    I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.    I am a partner in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the

Plaintiff.

4.    I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

5.    The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now

within this District.

6.    The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents

and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated: December 10, 2007
      Southport, CT

Kevin J. Lennón

8

# EXHIBIT 1

Code word for this Charter Party
**"SHELLTIME 4"**
*Issued December 1983.*

# Time Charter Party

Abu Dhabi

IT IS THIS DAY AGREED between Probo Bison Shipping Inc.

of           the Marshall Islands        (hereinafter referred to as "Owners"), being owners of the

good   motor   vessel called "Probo Bison"

(hereinafter referred to as "the vessel") described as per Clause 1 hereof and Combined Cargo UAE LLC

of   Abu Dhabi        (hereinafter referred to as "Charterers"):

1.   At the date of delivery of the vessel under this charter
    (a)   she shall be classed: DNV +1A1
    (b)   she shall be in every way fit to carry crude petroleum and/or its products the cargoes as described in Clauses 83 and 90 and lawful merchandise as per IMO Regulation in cargo holds and on deck
    (c)   she shall be tight, staunch, strong, in good order and condition, and in every way fit for the service, with her machinery boilers, hull and other equipment (including but not limited to hull stress calculator and radar) in a good and efficient state and the cargo holds/cranes/grabs fit for the service;
    (d)   her tanks, valves and pipelines shall be oil-tight;
    (e)   she shall be in every way fitted for burning

at sea - fuel oil with a maximum viscosity of   380   Centistokes at 50 degrees Centigrade/any commercial grade of fuel oil FACH99% for main propulsion. marine diesel oil/GGG Centistokes
in port - marine diesel oil/IA/CCH/S 380 CST for auxiliaries:

    (f)   she shall comply with the regulations in force so as to enable her to pass through the Suez and Panama Canals by day and night without delay;
    (g)   she shall have on board all certificates, documents and equipment required from time to time by any applicable law to enable her to perform the charter service without delay;
    (h)   she shall comply with the description in Form B appended hereto, provided however that if there is any conflict between the provisions of Form B and any other provision, including this Clause 1, of this charter such other provision shall govern.

2.   (a)   At the date of delivery of the vessel under this charter
      (i)   she shall have a full and efficient complement of master, officers and crew for a vessel of her tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be trained to operate the vessel and her equipment competently and safely;
      (ii)   all shipboard personnel shall hold valid certificates of competence in accordance with the requirements of the law of the flag state;
      (iii)   all shipboard personnel shall be trained in accordance with the relevant provisions of the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978 including amendments of 1995;
      (iv)   there shall be on board sufficient personnel with a good working knowledge of the English language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and to enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be carried out quickly and efficiently.

    (b)   Owners guarantee that throughout the charter service the master shall with the vessel's officers and crew, unless otherwise ordered by Charterers,
      (i)   prosecute all voyages with the utmost despatch;
      (ii)   render all customary assistance; and
      (iii)   load and discharge cargo as rapidly as possible when required by Charterers or their agents to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the case may be) and in each case in accordance with any applicable laws of the flag state.

3.   (i)   Throughout the charter service Owners shall, whenever the passage of time, wear and tear or any event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain or restore the conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel.
    (ii)   If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the requirements of Clauses 1, 2(a) or 10 then hire shall be reduced to the extent necessary to indemnify Charterers for such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49

under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time so lost. 50 51

Any reduction of hire under this sub-Clause (ii) shall be without prejudice to any other remedy available to Charterers under this charter party, but where such reduction of hire is in respect of time lost, such time shall be excluded 52 53

from any calculation under Clause 24. 54

(iii)   If Owners are in breach of their obligation under Clause 3(i) Charterers may to notify Owners in writing; and if, after the expiry of 30 days following the receipt by Owners of any such notice, Owners have failed to demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3(i), the vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they are exercising such due diligence. 55 56 57 58 59

~~Furthermore, at any time while the vessel is off hire under this Clause 3 Charterers have the option to terminate this charter by giving notice in writing with effect from the date on which such notice of termination is received by Owners or from any later date stated in such notice. This sub-Clause (iii) is without prejudice to any rights of Charterers or indulgences of Owners under this charter or otherwise including without limitation Charterers rights under Clause 21 hereof).~~ 60 61 62 63 64

4.    Owners agree to let and Charterers agree to hire the vessel for a period of 2 (two) years, 30 days more or less in Charterers' option, further 1 (one) year in Charterers' option to be declared by Charterers 4 months prior to expiration of the 2nd year 65

commencing from the time and date of delivery of the vessel, for the purpose of carrying all lawful merchandise (subject always to Clause 28) including in particular 66 67

to any port of the world, as Charterers shall direct, subject to the limits of the current British Institute Warranties and any subsequent amendments thereof excluding Cuba (save) (unless sanctions later withdrawn). Notwithstanding the foregoing, but subject to Clause 35, Charterers 68 69

may order the vessel to ice-bound waters or to any part of the world outside such limits provided that Owners consent thereto (such consent not to be unreasonably withheld) and that Charterers pay for any insurance premium required by the vessel's underwriters as a consequence of such order. See Clause 62. 70 71 72

Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places (which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine lines, alongside vessels or lighters, and other locations including locations at sea) where she can safely lie always afloat. Notwithstanding anything contained in this or any other part of this charter, Charterers do not warrant the safety of any place to which they order the vessel and shall be under no liability in respect thereof except for loss or damage caused by their failure to exercise due diligence as aforesaid. Subject as above, the vessel shall be loaded and discharged at any places as Charterers may direct, provided that Charterers shall exercise due diligence to ensure that any ship-to-ship transfer operations shall conform to standards not less than those set out in the latest published edition of the ICS/OCIMF Ship-to-Ship Transfer Guide 73 74 75 76 77 78 79 80 81

The vessel shall be delivered by Owners at a port in:see Clause 61 82

at Owners' option and redelivered to Owners at a port in  world-wide 83

at Charterers' option. 84

5.    The vessel shall not be delivered to Charterers before          15th May 2004  .          And Charterers shall have the option of cancelling this charter if the vessel is not ready and at their disposition on or before 85 86

6.    Owners undertake to provide and to pay for all provisions, wages and shipping and discharging fees and all other expenses of the master, officers and crew; also, except as provided in Clauses 4 and 34 hereof, for all insurance on the vessel, for all deck, cabin and engine-room stores, and for water; for all drydocking, overhaul, maintenance and repairs to the vessel; and for all-fumigation expenses and de-rat certificates. Owners' obligations under this Clause 6 extend to all liabilities for customs or import duties arising at any time during the performance of this charter in relation to the personal effects of the master, officers and crew, and in relation to the stores, provisions and other matters aforesaid which Owners are to provide and pay for and Owners shall refund to Charterers any sums Charterers or their agents may have paid or been compelled to pay in respect of any such liability. Any amounts allowable in general average for wages and provisions and stores shall be credited to Charterers insofar as such amounts are in respect of a period when the vessel is on-hire 87 88 89 90 91 92 93 94 95 96

7.    Charterers shall provide and pay for all fuel (except fuel used for domestic services), towage and pilotage and shall pay agency fees, port charges, commissions, expenses of loading and unloading cargoes, canal dues and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all charges for the said items shall be for Owners' account when such items are consumed, employed or incurred for Owners' purposes or while the vessel is off-hire (unless such items reasonably relate to any service given or distance made good and taken into account under Clause 21 or 22) and provided further that any fuel used in connection with a general average sacrifice or expenditure shall be paid for by Owners. 97 98 99 100 101 102 103

8.    Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of          per day, and pro rata for any part of a day, from the time and date of her delivery (local time) until the time and date of her redelivery (local time) to Owners. See Clause 48 104 105 106

9.  Subject to Clause 5(iii), payment of hire shall be made to immediately available funds to:  107

    Account  108

    i)  per calendar-month periodically in advance, less.  109

    ii)  any hire paid which Charterers reasonably estimate to relate to off-hire periods, and  110

    (iii)  any properly documented amounts disbursed on Owners' behalf, any advances and commission thereon, and charges which are for Owners' account pursuant to any provision hereof, and  111 / 112

    (iii)  any amounts due or reasonably estimated to become due to Charterers under Clause 3(ii) as thereof,  113 / 114

    any such adjustments to be made at the due date for the next monthly payment after the facts have been ascertained. Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners' account provided that Charterers have made proper and timely payment.  115 / 116 / 117

    In default of such proper and timely payment,  118

    (a)  Owners shall notify Charterers of such default and Charterers shall within seven five working days of receipt of  119

    such notice pay to Owners the amount due including interest, failing which Owners may withdraw the vessel from the service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise; and  120 / 121 / 122

    (b)  interest on any amount due but not paid on the due date shall accrue from the day after that date up to and including the day when payment is made, at a rate per annum which shall be 1% above the U.S. Prime Interest Rate as published by the Chase Manhattan Bank in New York at 12.00 New York time on the due date, or, if no such interest rate is published on that day, the interest rate published on the next preceding day on which such a rate was so published, computed on the basis of a 360 day year of twelve 30-day months, compounded semi-annually.  123 / 124 / 125 / 126 / 127 / 128

10.  The whole reach, burthen and decks of the vessel and any passenger accommodation (including Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall not, unless specially agreed, exceed 550 tonnes at any time during the charter period. See Clause 48.  129 / 130 / 131 / 132

11.  Overtime pay of the master, officers and crew in accordance with ship's articles shall be for Charterers'/Owners' account when incurred, as a result of complying with the request of Charterers or their agents, for loading, discharging, heating of cargo, bunkering or tank cleaning.  133 / 134 / 135

12.  Charterers shall from time to time give the master all requisite instructions and sailing directions, and he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents, may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports through voyage and other records as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master.  136 / 137 / 138 / 139 / 140 / 141

13.  (a)  The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign bills of lading as Charterers or their agents may direct always in conformity with Mate's receipt (subject always to Clauses 33(c) and 50) without prejudice to this charter.  142 / 143 / 144

    Charterers hereby indemnify Owners against all consequences or liabilities that may arise  145
    (i)  from signing bills of lading in accordance with the directions of Charterers or their agents, to the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as provided in Clause 13(b)) from the master otherwise complying with Charterers or their agents orders  146 / 147 / 148
    (ii)  from any irregularities in papers supplied by Charterers or their agents.  149

    (b)  Notwithstanding the foregoing, Owners shall not be obliged to comply with any orders from Charterers to discharge all or part of the cargo  150 / 151
    (i)  at any place other than that shown on the bill of lading and/or  152
    (ii)  without presentation of an original bill of lading  153
    unless they have received from Charterers both written confirmation of such orders and an indemnity in a form acceptable P and I Club Wording to Owners.  154 / 155

14.  If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without delay, make a change in the appointments and Owners shall in any event communicate the result of their investigations to Charterers as soon as possible.  156 / 157 / 158 / 159

15.  Charterers shall accept and pay for all bunkers on board at the time of delivery (see Clause 61), and Owners shall on redelivery  160
    (whether it occurs at the end of the charter period or on the earlier termination of this charter) accept and pay for all bunkers remaining on board, at the then current market price at the port of delivery or redelivery, as the case may be, or if such prices are not available payment shall be at the then current market price at the  161 / 162 / 163

nearest port at which such prices are available; provided that if delivery or redelivery does not take place in a port | 164
payment shall be at the price paid at the vessel's last port of bunkering before delivery or redelivery, as the case | 165
may be. Owners shall give Charterers the use and benefit of any fuel contracts they may have in force from time to | 166
time, if so required by Charterers, provided suppliers agree. | 167

16.   Stevedores when required shall be employed and paid by Charterers, but this shall not relieve Owners | 158
from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict | 159
account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents | 170
against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of | 171
pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in | 172
the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact | 173
the servants of Charterers their agents or any affiliated company); provided, however, that | 174

(i)   the foregoing indemnity shall not exceed the amount to which Owners would have been | 175
entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and | 176
(ii)   Charterers shall be liable for any damage to the vessel caused by or arising out of the use of | 177
stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to | 178
obtain redress therefor from stevedores. See Clause 92. | 179

17.   Charterers may send representatives in the vessel's available accommodation upon any voyage made | 180
under this charter, Owners finding provisions and all requisites as supplied to officers, except liquors. Charterers | 181
paying at the rate of $ cost per day for each representative while on board the vessel. | 182

18.   Charterers may sublet the vessel, but shall always remain responsible to Owners for due fulfilment of | 183
this charter. | 184

19.   If when a payment of hire is due hereunder, Charterers reasonably expect to redeliver the vessel before | 185
the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of | 186
the time necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers | 187
may deduct anything due or reasonably expected to become due for | 188

(i)   disbursements on Owners' behalf or charges for Owners' account pursuant to any provision | 189
hereof, and | 190
(ii)   bunkers on board at redelivery pursuant to Clause 15. | 191
Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made | 192
good by Charterers. | 193
If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a | 194
ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the | 195
vessel at the same rate and conditions as stated herein for as long as necessary to complete such ballast voyage, or | 196
to complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be. | 197

20.   Should the vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her loss; | 198
should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon on the day on | 199
which the vessel's underwriters agree that the vessel is a constructive total loss; should the vessel be missing, hire | 200
charter shall terminate and hire shall cease at noon on the day so which she was last heard of. Any hire paid in | 201
advance and not earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of | 202
the estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last | 203
bunkering port. | 204

21.   (a)   On each and every occasion that there is loss of time (whether by way of interruption in the | 205
vessel's service or, loss reduction in the vessel's performance, or in any other manner) | 206

(i)   due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and waiting | 207
to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the | 208
vessel or her equipment (including without limitation tank cleaning); overhaul, maintenance or survey; collision, | 209
stranding, accident or damage to the vessel; or any other similar cause preventing the efficient working of the | 210
vessel; and such loss continues for more than three consecutive hours (if resulting from interruption in the vessel's | 211
service) or cumulates to more than three hours (if resulting from partial loss of service); or | 212

(ii)   due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the | 213
master, officers or crew; or | 214
(iii)   for the purpose of obtaining medical advice or treatment for or landing any sick or injured | 215
person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the | 216
body of any person (other than a Charterers' representative); and such loss continues for more than three | 217
consecutive hours; or | 218
(iv)   due to any delay in quarantine arising from the master, officers or crew having had | 219
communication with the shore of any infected area without the written consent of Charterers or their | 220
agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local | 221
law on the part of the master, officers or crew; or | 222
(v)   due to the detention of the vessel by authorities at home or abroad attributable to legal action | 223
against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or | 224
neglect of Charterers); then | 225

without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers 226
hereunder or otherwise the vessel shall be off-hire from the commencement of such loss of time until she is again 227
ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at 228
which such loss of time commenced: provided, however, that any service given or distance made good by the 229
vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire. 230

(b)    If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure 231
arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel 232
shall be off-hire under this Clause 21 shall be the difference between 233

(i)    the time the vessel would have required to perform the relevant service at such guaranteed 234
speed, and 235

(ii)    the time actually taken to perform such service (including any loss of time arising from 236
interruption in the performance of such service). 237

For the avoidance of doubt, all time included under (ii) above shall be excluded from any 238
computation under Clause 24. 239

(c) Further and without prejudice to the foregoing, in the event of the vessel deviating (which 240
expression includes without limitation putting back, or putting into any other than that to which she is bound 241
under the instructions of Charterers) for any cause or purpose mentioned in Clause 21(a), the vessel shall be 242
off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state 243
to resume her service, from a position not less favourable to Charterers than that at which the deviation 244
commenced: provided, however, that any service given or distance made good by the vessel whilst so off-hire 245
shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or 246
purpose mentioned in Clause 21 (a), puts into any port other than the port to which she is bound on the 247
instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners. 248
Should the vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and 249
payable during any time lost thereby. 250

(d)    If the vessel's flag state becomes engaged in hostilities and Charterers in consequence of such 251
hostilities find it temporarily impracticable to employ the vessel and have given Owners written notice thereof 252
then from the date of receipt by Owners of such notice until the termination of such commercial impracticability 253
the vessel shall be off-hire and Owners shall have the right to employ the vessel on their own account. 254

(e)    Time during which the vessel is off-hire under this charter shall count as part of the charter 255
period. See Clause 52(b). 256

10:    Owners have the right and obligation to dry-dock the vessel at regular intervals of 24 months 257
On such occasion Owners shall propose to Charterers a date on which they wish to 258
drydock the vessel, not less than 90 days before such date, and Charterers shall offer the parties shall mutually 259
agree a port for 260
such periodical drydocking and Charterers shall take all reasonable steps to make the vessel available to be at 260
such date as 260
practicable. 261

Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers 262
place the vessel at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be 263
responsible for and pay for the disposal into reception facilities of such tank washings and residues and shall have 264
the right to retain any monies received therefor, without prejudice to any claim for loss of cargo under any bill of 265
lading or this charter. 266

(b)    If a periodical drydocking is carried out in the port offered by Charterers (which must have 267
suitable accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall 268
be off-hire from the time she arrives at such port until drydocking is completed and she is in every way ready to 269
resume Charterers' service and is at the position at which she was off-hire or a position no less favourable to 270
Charterers, whichever she first attains. However, 271

(i) provided that Owners exercise due diligence in gas-freeing, any time lost in gas-freeing to 272
the standard required for entry into drydock for cleaning and painting the hull shall not count as off-hire, whether 273
lost on passage to the drydocking port or after arrival there (notwithstanding Clause 21); and 274

(ii)    any additional time lost if further gas-freeing to meet the standard required for hot work or 275
entry to cargo tanks shall count as off-hire, whether lost to passage to the drydocking port or after arrival there. 276

Any time which, but for sub-Clause (i) above, would be off-hire, shall not be included in any 277
calculation under Clause 24. 278

The 'expenses' of gas-freeing, including without limitation the cost of bunkers, shall be for 279
Owners account. 280

(c)    If Owners require the vessel instead of proceeding to the offered port, to carry out periodical 281
drydocking at a special port selected by them, the vessel shall be off-hire from the time when she is released to 282
proceed to the special port until she next presents for loading in accordance with Charterers' instructions, 283
provided, however, that Charterers shall credit Owners with the time which would have been taken taken on passage 284
at the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but 285
Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage 286
calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any 287
benefit they may gain in purchasing bunkers at the special port. Owners to have the option to perform a round 288
lation voyage from the area vessel released to Owners up to the drydock area and then to the area she next presents 288
for loading in accordance with Charterers instructions. In such case, Owners will not receive credit from 288
Charterers for vessel's operation. 288

(d)    Charterers shall, insofar as cleaning for periodical drydocking may  have reduced the amount of 289
tank-cleaning necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which 290
Charterers calculate to have been saved thereby, whether the vessel drydocks at or offered the mutually agreed or 291
a special port.

23.    Charterers shall have the right at any time during the charter period to make such inspection of the vessel as they 292
may consider necessary. This right may be exercised as often and at such intervals as Charterers in their absolute 293
discretion may determine and whether the vessel is in port or on passage. Provided no undue delays to Vessel's 294
operation occur, Owners affording all

necessary co-operation and accommodation on board provided, however, 295
(i)    that neither the exercise nor the non-exercise, nor anything done or not done in the exercise 296
of such right shall in any way reduce the master's or Owners' authority over, or 297
responsibility to Charterers or third parties for, the vessel and every incident of her operation, nor increase 298
Charterers' responsibilities to Owners or third parties for the same; and 299
(ii)    that Charterers shall not be liable for any act, neglect or default  by themselves, their 300
servants or agents in the exercise or non-exercise of the aforesaid right. 301

24.    (a)    Owners guarantee that the  speed and consumption of the vessel shall  be as follows:- 302

| Average speed | | Maximum average bunker consumption:- | | |
|---|---|---|---|---|
| in knots | | main propulsion | auxiliaries | 303 304 |
| | | fuel oil/diesel oil/fuel oil/diesel oil | | 305 |
| Laden | | tonnes | tonnes | 306 |

See Clause 47

Ballast 307

The foregoing bunker consumptions are  for all  purposes except cargo heating and tank cleaning and 308
shall be pro-rated between the speeds shown. 309
The service speed of the vessel is see Clause 47 knots laden and See Clause 47 knots in ballast and in the 310
absence of Charterers' orders to the contrary the vessel shall proceed at the service speed. However if more than 311
one laden and one ballast speed are shown  in the table above Charterers shall have the right to order the vessel to 312
steam at any speed within the range set out in the table (the "ordered speed"). 313
If the vessel is ordered to proceed at any speed other than the highest speed shown in  the table, and 314
the average speed actually attained by the vessel during the currency  of such order exceeds  such ordered 315
speed plus 0.5 knots (the "maximum  recognised speed"), then for the purpose of calculating any increase or 316
decrease of hire under this Clause 24 the maximum recognised speed shall be used in place of the average speed 317
actually attained. 318
For the purposes of this clause the "guaranteed speed" at any time shall  be the  then current 319
ordered speed or the service speed, as the case may be 320
The average speeds and bunker consumptions shall  for the purposes of this Clause 24 be 321
calculated by reference to the observed distance from pilot station to pilot station on all sea passages during each 322
period chartered in Clause 24 (c), but excluding any time during which the vessel is (or has for Clause 22(b) (i) 323
would be) off-hire and also excluding "Adverse Weather Periods", being (i) any periods during which reduction 324
of speed is necessary for safety in congested waters or poor visibility (ii) any days..when..it...mater..winds 325
exceed force 7 on the Beaufort Scale for more than 12 hours. 326

(b)    If during any year  from the date on which the  vessel enters service (anniversary to anniversary) 327
the vessel  falls below or exceeds  the performance guaranteed in Clause 24(a) then if such shortfall or excess 328
results 329
(i)    from a reduction or an increase  in the average speed of the vessel, compared to the speed 330
guaranteed in Clause 24(a), then an amount equal to the value at the hire rate of the time so lost or gained, as the 331
case may be, shall be deducted from or added to the hire paid; 332
(ii)    from an increase or a decrease in the total bunkers consumed, compared  to the total bunkers 333
which would have been consumed had the vessel performed as guaranteed in Clause 24(a), an amount  equivalent 334
to the value of the additional bunkers consumed or the bunkers saved, as the case may be, based on the average 335
price paid by Charterers for the vessel's bunkers in such period, shall be deducted from or added to the hire paid. 336
The addition to or deduction from hire as calculated  for laden  and ballast mileage respectively 337
shall be adjusted to take into account the mileage steamed in each such condition during Adverse Weather 338
Periods, by dividing such addition or deduction by the  number of miles over which the performance has  been 339
calculated and multiplying by  the same number of miles plus the miles steamed during the Adverse Weather 340
Periods, in order to establish the total addition to or deduction from hire to be made for such period. 341
Reduction of hire under the foregoing  sub-Clause (b)  shall  be without prejudice to any  other 342
remedy available to Charterers under this Charter Party. 343
(c)    Calculations under this Clause 24 shall be made  for the yearly periods  terminating,  on each 344
successive anniversary of the date on which the vessel enters service and for the period between the last such 345
anniversary and the date of termination of this charter if less than a year. Claims in respect of reduction of hire 348

arising under this Clause during the final year or part year of the charter period shall in the first instance be settled 347
in accordance with Charterers' estimate made fully substantiated two months before the end of the charter period, 348
Any necessary

adjustment after this charter terminates shall be made by payment by Owners to Charterers or by Charterers to 349
Owners as the case may require. 350

Payments in respect of increase of hire arising under this Clause shall be made promptly after 351
receipt by Charterers of all the information necessary to calculate such increase. 352

25.    Subject to the provisions of Clause 21 hereof, all loss of time and all expenses (excluding any damage to 353
or loss of the vessel or third parties' liabilities to third parties) incurred in saving or attempting to save life or in 354
successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that 355
Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of 356
services rendered under this Clause 25. 357

All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers 358
after deducting the master's, officers' and crew's share. 359

26.    Owners shall have a lien upon all cargoes and all sub-freights, sub-hire and demurrage for any amounts 360
due under this charter and Charterers shall have a lien on the vessel for all monies paid in advance and not 361
earned, and for all claims for damages arising from any breach by Owners of this charter. 362

27.    (a)    The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided, 363
be liable for any loss or damage or delay or failure arising or resulting from any act, neglect or default of the 364
master, pilots, mariners or other servants of Owners in the navigation or management of the vessel; fire, unless 365
caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea; explosion, 366
bursting of boilers, breakage of shafts or any latent defect in hull, equipment or machinery; provided, however, 367
that Clauses 1, 2, 3 and 24 hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or 368
Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable for any loss or damage 369
or delay or failure in performance hereunder arising or resulting from act of God, act of war, seizure under legal 370
process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil commotions or arrest or 371
restraint of princes, rulers or people. 372

(b) The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels 373
in distress and to deviate for the purpose of saving life or property. 374

(c) Clause 27(a) shall not apply to or affect any liability of Owners or the vessel or any other relevant 375
person in respect of 376

(i)    loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane 377
or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter, 378
whether or not such works or equipment belong to Charterers, or 379

(ii)    any claim (whether brought by Charterers or any other person) arising out of any loss of or 380
damage to or in connection with cargo. All such claims shall be subject to the Hague-Visby Rules or the Hague 381
Rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant bill 382
of lading (whether or not such Rules were so incorporated) or, if no such bill of lading is issued, to the Hague- 383
Visby Rules. 384

(d)    In particular and without prejudice, the foregoing subsections (a) and (b) of this Clause shall not 385
apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire. 386

28.    No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the foregoing any 387
damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such damage, shall be 388
for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that would expose the 389
vessel to capture or seizure by rulers or governments. 390

29.    Charterers shall supply marine diesel oil/fuel oil with a maximum viscosity of    380    Centistokes at 50 391
degrees Centigrade/MDGO for main propulsion and diesel oil/MDGO for the auxiliaries. If Owners require 392
the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost thereof. 393

Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality 394
complying with the International Marine Bunker Supply Terms and Conditions of Shell International Trading 395
Company and with the specification for marine fuels as amended from time to time. 396

30.    Should the master require advances for ordinary disbursements at any port, Charterers or their agents 397
shall make such advances to him, in consideration of which Owners shall pay a commission of two and a half per 398
cent, and all such advances and commission shall be deducted from hire. 399

31.    Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the 400
vessel at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be 401
adjusted to reflect any net increase in expenditure reasonably incurred or any net saving which should 402
reasonably be made by Owners as a result of such lay-up. Charterers may exercise the said option any number of 403
times during the charter period. See Clause 56. 404

32.   Should the vessel be requisitioned by any government, de facto or de jure, during the period of this charter, the vessel shall be off-hire during the period of such requisition, and any hire paid by such government in respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of the charter period.  405 406 407 408

33.   If war or hostilities break out between any two or more of the following countries: U.S.A., U.S.S.R., Russia, P.R.C., U.K., Norway, Greece, Netherlands—both Owners and Charterers shall have the right to cancel this charter.  409 410

34.   If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war, Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of such expenses as soon as practicable and in any event before such expenses are incurred, and provided further that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any claims by Owners under their war risk insurance arising out of compliance with such orders.  411 412 413 414 415 416

35.   (a)   The master shall not be required or bound to sign bills of lading for any place which in his or Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade, war, hostilities, warlike operations, civil war, civil commotions or revolutions.  417 418 419

  (b)   If in the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in Clause 35(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach or enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter (a "place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or discharged, as the case may be, at any other place within the trading limits of this charter (provided such other place is not itself a place of peril). If any place of discharge is or becomes a place of peril, and no orders have been received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.  420 421 422 423 424 425 426 427 428 429 430

  (c)   The vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever given by the government of the state under whose flag the vessel sails or any other government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority or by any committee or person having under the terms of the war risk insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations anything is done or not done, such shall not be deemed a deviation.  431 432 433 434 435 436 437 438 439

  If by reason of or in compliance with any such direction or recommendation the vessel does not proceed to any place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed to any place which the master or Owners in his or their discretion select and there discharge the cargo or such part of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners obligations under this charter so far as cargo so discharged is concerned.  440 441 442 443 444

  Charterers shall procure that all bills of lading issued under this charter shall contain the Chamber of Shipping War Risks Clause 1952.  445 446

36.   If the liability for any collision in which the vessel is involved while performing this charter falls to be determined in accordance with the laws of the United States of America, the following provision shall apply:  447 448

  "If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying ship or her owners to the owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier."  449 450 451 452 453 454 455

  "The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact."  456 457 458

  Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be determined in accordance with the laws of the United States of America.  459 460 461

37.   General average contributions shall be payable according to the York/Antwerp Rules, 1974/1994, and shall be adjusted in London in accordance with English law and practice but should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply:  462 463 464

  "In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the  465 466

consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers, 467
consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any 468
sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and 469
special charges incurred in respect of the cargo." 470

"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said 471
salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover 472
the estimated contribution of the cargo and any salvage and special charges thereon shall if required, be made by 473
the cargo, shippers, consignees or owners of the cargo to the carrier before delivery." 474

Charterers shall procure that all bills of lading issued under this charter shall contain a provision to the 475
foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and 476
practice of the United States of America. 477

38.     Charterers shall procure that all bills of lading issued pursuant to this charter shall contain the 478
following clause 479

"(1) Subject to sub-clause (2) hereof, this bill of lading shall be governed by, and have effect subject 480
to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of 481
Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed 482
at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be 483
deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his 484
responsibilities or liabilities under the "Hague-Visby Rules." 485

"(2) If there is governing legislation which applies the Hague Rules compulsorily to this bill of lading, 486
to the exclusion of the Hague-Visby Rules, then this bill of lading shall have effect subject to the Hague Rules. 487
Nothing herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities 488
or an increase of any of his responsibilities or liabilities under the Hague Rules." 489

"(3) If any term of this bill of lading is repugnant to the Hague-Visby Rules, or Hague Rules if 490
applicable, such term shall be void to that extent but no further." 491

"(4) Nothing in this bill of lading shall be construed as in any way restricting, excluding or waiving the 492
right of any relevant party or person to limit his liability under any available legislation and/or law." 493

39.     ~~Owners warrant that the vessel is~~ 494
~~(i)~~  ~~a tanker in IWW H Oil used~~ 495
~~(ii)~~  ~~properly entered in~~                              P & I Club 496

~~and will so remain during the currency of this charter.~~ 497
~~There is no escape or discharge of Oil occurs from the vessel and~~ 498
~~Damage or ... than there is to the ... caused or discharge Oil for ... grave and imminent danger of the~~ 499
~~escape or discharge of Oil which shall occurred would create a serious danger of Pollution Damage, whether or~~ 500
~~not an escape or discharge in fact subsequently occurs), then Charterers may, at their option, upon notice to~~ 501
~~Owners or master, and/or to such measures as are reasonably necessary to prevent or minimise such Pollution~~ 502
~~Damage or to remove the Threat, unless Owners promptly undertake the same. Charterers shall keep Owners~~ 503
~~advised of the nature and result of any such measures taken by them and if the measures in the nature of the~~ 504
~~measures intended to be above by them. Any of the aforementioned measures taken by Charterers shall be~~ 505
~~treated taken on Owners' authority, as Owners' agent, and shall be at Owners' expense except to the extent that.~~ 506
~~(1)   any such escape   or discharge or Threat was caused or contributed to by Charterers; or~~ 507
~~(2)   by reason of the exceptions set out in article III, paragraph 2 of the 1969 International~~ 508
~~Convention on Civil Liability for Oil Pollution Damage (or as it is, and would Convention applied in such~~ 509
~~escape or discharge; or to the Threat, would have been exempt from liability for the same, or~~ 510
~~(3)   the cost of such measures together with all other liabilities, costs and expenses of Owners arising~~ 511
~~out of or in connection with such escape or discharge or Threat exceeds one hundred and sixty United States~~ 512
~~Dollars (US$160), or its equivalent in other currency. Tonnage or claims millioneight hundred thousand United States~~ 513
~~Dollars (US $18,000,000), whichever is the lower, save and insofar as Owners shall be entitled to recover such~~ 514
~~excess under either the ... 1971 International Convention on the Establishment of an International Fund for~~ 535
~~Compensation for Oil Pollution Damage or under CRISTAL.~~ 536

~~PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures~~ 517
~~should be discontinued, Owners shall on notify Charterers and thereafter Charterers shall have to right to~~ 518
~~continue said measures under the provisions of this Clause 39 ... all further liability to Charterers under~~ 519
~~this Clause 39 shall thereupon cease.~~ 520

~~The above provisions are not in derogation of such other rights as Charterers or Owners may have~~ 521
~~under this charter or may otherwise have or acquire by law or the International Convention or TOVALOP.~~ 522

~~The term TOVALOP means the Tanker Owners' Voluntary Agreement Concerning Liability~~ 523
~~for Oil Pollution dated 7 January 1969, as amended from time to time and the term CRISTAL means the~~ 524
~~Contract Regarding an Interim Supplement to Tanker Liability for Oil Pollution dated 14 January 1971, as~~ 525
~~amended from time to time. The terms Oil, Pollution Damage and Tonnage shall for the purposes of this~~ 526
~~Clause 39 have the meanings ascribed to them in TOVALOP.~~ 527

40.     The master shall not be required or bound to sign bills of lading for the carriage of cargo to any place to which 528
export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was 529
produced and/or shipped. 530

Charterer shall procure that all Bills of lading issued under this charter shall contain the following clause:                                                                                                    531
                                                                                                    532

"If any laws rules or regulations applied by the government of the country in which the cargo was    533
condoned and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo    534
to the place of discharge designated in or ordered under this bill of lading, carriers shall be entitled to    535
require cargo owners forthwith to nominate an alternative discharge place for the discharge of the    536
cargo, or such part of it as may be affected, which alternative place shall not be subject to the    537
prohibition, and carriers shall be entitled to accept orders from cargo owners to proceed to and    538
discharge at such alternative place. If cargo owners fail to nominate an alternative place within 72    539
hours after they or their agents have received from carriers notice of such prohibition, carriers shall be    540
at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place    541
on which they or the master may in their or his abundant discretion decide and which is not subject to the    542
prohibition, and such discharge shall constitute due performance of the contract contained in this bill    543
of lading so far as the cargo so discharged is concerned".                                          544

The foregoing provision shall apply mutatis mutandis to this charter, the references to a bill of lading    545
being deemed to be references to this charter.                                                      546

41.   (a)    This charter shall be construed and the relations between the parties determined in accordance    547
with the laws of England.                                                                           548
      (b)    Any dispute arising under this charter shall be decided by the English Courts to whose    549
jurisdiction the parties hereby agree.                                                              550
      (c)    Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain    551
the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect    552
to have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the    553
provisions of the Arbitration Act 1996/1998, or any statutory modification or re-enactment thereof for the time    554
being in force.                                                                                     555

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) terms current at the time when the arbitration proceedings are commenced. The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and give notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement. Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator. In cases where neither the claim nor any counterclaim exceeds the sum of USD50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

~~(i)  A party shall lose its right to make such an election only if:~~                              556
     ~~(ii)  it receives from the other party a written notice of dispute which:~~                  557
          ~~(1)  states expressly that it disputes any action out of this charter~~                 558
          ~~(2)  specifies the nature of the dispute; and~~                                         559
          ~~(3)  refers expressly to this clause 41(c)~~                                            560
     ~~and~~                                                                                        561
     ~~(b)  it fails to give notice of election to have the dispute referred to arbitration not later than~~    562
     ~~28 days from the date of receipt of such notice of dispute~~                                 563

~~(iii)  The parties hereby agree that neither may—~~                                               564
     ~~(a)  appeal to the High Court on any question of law arising out of an award;~~              565
     ~~(b)  apply to the High Court for an order that the arbitration state the reasons for his award;~~    566
     ~~(c)  have notice to the arbitrator that a reasoned award is required; and~~                  567
     ~~(d)  apply to the High Court to determine any question of law arising in the course of the~~    568
     ~~reference.~~                                                                                 569

      (d)   It shall be a condition precedent to the right of any party to a stay of any legal proceedings in    570
which maritime property has been, or may be, arrested in connection with a dispute under this charter, that that    571
party furnishes to the other party security to which that other party would have been entitled in such legal    572
proceedings in the absence of a stay.                                                               573

42.   The side headings have been included in this charter for convenience of reference and shall in no way affect the    574
construction hereof.                                                                                575

Additional Clauses 43 – 97 both inclusive and addition to Form B as attached and Appendix 1 and 2 as attached to be incorporated in this Charter Party and to form part of same.

Additional Clauses to

# M/V "PROBO BISON"

Charter Party dated Abu Dhabi,

GENERAL

Clause 43:

Deleted

Clause 44:

At any time while the vessel is on off-hire under Clause 3 Charterers have, subject to clause 42 above, the right to demand that reasonable specific corrective measures be taken by Owners, including but not limited to funding of repairs/upgrading. This clause is without prejudice to any rights or obligations of Owners or Charterers under this Charter or otherwise (including without limitation Clauses 1, 3 and 21).

Clause 45:

If at any time during the charter party period Charterers should be dissatisfied with the managers appointed by the Owners, they will provide Owners and Mortgagees with written reasons for their dissatisfaction so that Owners and Charterers can review and if possible correct the problem. If the problem has not been corrected within a period of 60 days the date of Charterers' written complaint, Charterers shall be entitled to demand in writing that the managers be replaced by new managers approved by Charterers, such approval not to be withheld (it being understood that Charterers not use this provision to insist that International Tanker Management Norway A.S. be re-appointed as managers). The change of managers shall take place within a period of two months from the date of Charterers' demand.

Clause 46:    Hire:

| | |
|---|---|
| 1st year | USD 16,500 daily |
| 2nd year | USD 16,500 daily |
| 3rd optional year | USD 14,000 daily |

Rates include overtime. A commission of 1.25% is payable by the vessel and Owners to Cresco Services Ltd on hire earned and paid under this Charter and also upon any continuation and extension of this Charter. This commission to be deductible from hire at source.

Clause 47:    Speed/consumption specification in Clause 24 (a) to be as follows:

| | Laden | | | Ballast | | |
|---|---|---|---|---|---|---|
| | Knots | Fuel | Diesel | Knots | Fuel | Diesel |
| **Light** | | | | | | |
| Comb. 1 | 14.5 | 37.5 | 0 | 15.0 | 39.0 | 0 |

| Comb. 2 | 14.0 | 33.5 | 0 | 14.5 | 34.5 | 0 |
| Comb. 3 | 13.5 | 30.0 | 0 | 14.0 | 30.5 | 0 |
| Comb. 4 | 13.0 | 27.0 | 0 | 13.5 | 27.5 | 0 |
| **Heavy** | | | | | | |
| Comb. 5 | 14.0 | 39.5 | 0 | 15.0 | 39.0 | 0 |
| Comb. 6 | 13.5 | 35.5 | 0 | 14.5 | 34.5 | 0 |
| Comb. 7 | 13.0 | 32.0 | 0 | 14.0 | 30.5 | 0 |
| Comb. 8 | 12.5 | 29.5 | 0 | 13.5 | 27.5 | 0 |

Consumption is in metric tons per 24 hours. Fuel consumption includes fuel on A/E for domestic purposes (3.4 metric tons), but excludes additional consumption for heating of cargo, tank cleaning, inerting of tanks etc.

"Light laden" is defined as laden draft up to/including 11.89 m. "Heavy laden" is defined as laden draft above 11.89 m.

For the performance calculation referred to in Clause 24 (b), a margin of ±0.5 knots on the speed and     ± 4% on     the consumption to be applied before calculating as per Bulkhandling Rules & Practices.

Consumption in port, idle                : 3.4 mt/day fuel

Consumption in port, working cranes      : 5.0 mt/day fuel

Consumption for heating of cargo, tank cleaning, inerting of tanks etc. are excluded from the above figures.

Clause 48:  Maximum quantity allowed vessel for stores, luboil and fresh water for domestic purposes not to exceed 350 tons.

Any discrepancy resulting in reduced cargo capacity due to excessment of above allowances to be compensated to Charterers by Owners by paying deadfreight according to the freight rate ruling for the reduced cargo.

Clause 49:  If any extra equipment such as container fittings and lashings should be required for any cargo, same to be for Charterers' account. Removal and/or delay due to such equipment to be for Charterers' account. Vessel to take good care of and maintain such equipment when on board.

Special equipment (booster-pump etc.) which may be installed for molasses trading or other cargoes to be for Charterers' account. However, such equipment to be maintained and cared for by the crew as if said equipment was Owners'

Clause 50  The vessel has installed telex/maritime satellite/telefax/e-mail communication system in working order throughout the Charter Party period.

Clause 51  Charterers to be permitted to load or discharge at safe ports/places/anchorages from/into other vessel(s)/barge(s) alongside, using gear as available. Master shall

immediately advise in writing the Master of the other vessel(s)/barge(s) of any damage claimed and do the utmost to have same accepted. Also advise Charterers of any damage done to others. Such operation to be performed safely to Master's satisfaction, but understood that this approval not to be unreasonably withheld. Any customary extra insurance involved for such operation, if any, shall be for Charterers' account.

Extra equipment, such as fenders, deemed by the Master to be necessary shall be provided and paid for by Charterers.

Otherwise see Clause 4 line 8ff and 81.

Clause 52:    Cleaning and cargo hold preparation of vessels cargo holds/lines/pumps between different cargoes to be performed by vessel's crew. Any delay caused by vessel's holds not being accepted on arrival loading ports and delay for cleaning holds shall –with the exceptions stipulated in paragraph two of this clause- be for Owners' account. If Owners require assistance from shore same to be for their account. In the event vessel is turned to wet mode after a prolonged trading at dry mode, Owners shall best endeavour to make tanks suitable for loading. However, Owners shall not be held responsible if tanks are rejected due to coating having sustained damage due to carriage of dry cargoes.

Vessel to be considered off-hire for any time in excess of maximum time allowed in cleaning timetable Probo Cargo Manual attached hereto as Appendix 1. except for circumstantial delays caused by proven adverse weather conditions port restrictions. For cleaning programs which are not specified in said Appendix I the maximum time allowed shall be mutually agreed between Owners and Charterers.

The above shall not apply when:

1. the vessel is loading multiple parcels at one berth and the failure of one or more tanks/holds does not delay the departure from berth;

2. the installation permits loading of homogenous cargo to commence despite the fact that all tanks/holds are not accepted;

3. it is determined that insufficient cleaning has been allowed or insufficient cleaning material has been provided.

4. despite best efforts rendered by vessel's crew to prepare holds/tanks, vessel may not be able to        for "zero tolerance"    required by some shippers due to vessel's history of previous cargoes.

Cost of cleaning materials such as chemicals, detergent, light fuel, as cleaning agent and fresh water to be for Charterers account. All tank cleaning to be done in accordance with tank lining manufacturers procedures.

Charterers shall comply with tank lining manufacturers' curing instructions (if any) between cargoes as per tank manufacturers' resistance guide manual, and cargo loading sequence shall follow coating manufacturers' curing time.

It is understood that if the last cargo is fishoil, vegoil or molasses, Charterers will pay Owners 1.5 days extra in lieu of hold cleaning. However, Charterers shall have

the option to redeliver the vessel clean to CPP underkat 2.5 NPA unleaded standard without cleaning bonus.

Clause 53:     Drug and Alcohol Clause

Owner warrants that it has a policy on drug and alcohol abuse applicable to the vessel which meets or exceeds the standards in The Oil Companies International Marine Forum Guidelines For the Control of Drug and Alcohol onboard ship, OCIMF January 1990. Owner further warrants that this policy will remain in effect during the term of this Charter, and that Owner shall exercise due diligence to ensure that the policy is complied with.     It is understood that an actual impairment or any test finding an impairment shall not in itself mean that the Owners have failed to exercise due diligence.

Clause 54:     The vessel's loading and discharging equipment to be at Charterers' disposal, and vessel's crew to operate same up-to 24 consecutive hours per day if required without any extra expense to the Charterers, provided local labour rules and regulations permit.

Clause 55:     Any time lost by breakdowns and other stops and time lost by reduced capacity of vessel's crane(s) and/or grab(s) and/or pumps to be considered as off-hire, and shall be reported by the vessel to the Charterers and / or any other party nominated by the Charterers on the form "off-hire certificate". However, if breakdown is due to stevedore damage for which the Charterers are responsible under clause 91, then the resulting delay shall not be considered as off-hire periods.

Clause 56:     The Charterers shall have the right to order a laying-up of the vessel at any time for any period of time at a safe berth/place, and in the event of such lay-up the Owners shall take steps to effect all the economies in operating costs including insurance which may be possible and give prompt credit to the Charterers in respect of all such economies. At the request of the Charterers at any time, the Owners shall furnish     an estimate of the economies which would be possible in the event of a laying-up of the vessel. On termination of lay-up Charterers shall arrange for underwater cleaning of vessel's hull and propeller at their time and expense, so vessel may resume service speed.

Clause 57:     Any reduction in insurance premium on account of long stay in port, to be reimbursed Charterers.

Clause 58:     Owners warrant that crew will be members of I.T.F. approved Union and will have a world wide I.T.F. certificate for officers     and crew.

Should the vessel be blockaded or black listed, in any port or place because of her flag or crew, all expenses, delays or other consequences to be for Owners' account.

Owners warrant that the vessel is not boycotted by Arab League.

In the event of the vessel being denied or restricted in the use of port and/or loading and/or discharging facilities or shore labour and/or tug or pilotage assistance because of the vessel's flag or ownership or management or the wages or conditions of employment of her officers and/or crew or of the officers and/or crew    of    any

other vessel under the same ownership or management or because of the previous trading of the vessel or any other vessel as aforesaid, hire shall cease for the time hereby lost and Owners shall be responsible for and shall promptly reimburse Charterers all extra expenses which Charterers may incur in trying to solve the situation (including proceeding to an alternative berth or port). However, in case the previous trading in question refers to Charterers' operation of the vessel or other Charterers' vessel(s) the foregoing provisions shall not apply.

Clause 59:    The vessel shall comply with any safety regulations requirements in effect at ports of loading and/or discharging, with particular reference to the United States Department of Labour Safety and Health Regulations set forth in Part III of the Federal Register.

Should the vessel not meet with safety rules and regulations, Owners shall take immediate corrective measures and any stevedore stand-by-time and other expenses involved, including off-hire, will be for Owners' account.

Vessel to have current and valid cargo gear register and certificates to the effect that the cargo gear has been tested, examined and annealed in accordance with the requirements of International Labour Organisation.

Clause 60:    The vessel shall comply with:

- WWF regulations for ladders in cargo holds.

- SOLAS 1974/78 and MARPOL 1973/78 Regulations and OCIMP Recommendations for standardisation of tanker manifold and associated equipment (excluding bunkering lines).

- OCIMP guidelines.

- To have secured and carries a US Federal Maritime Commission's Certificate of Financial Responsibility as required under the US Water Quality Improvement Act of 1970.

- To have secured and carries onboard a Civil Liability Certificate.

- Owners warrant that the vessel is eligible for bunker in the United States of America, its territories and possessions in accordance with US Department of commerce, Office of International Trade, Directive No. 705.

Clause 61:    "PROBO BISON" to be delivered to Charterers when in every respect fitted for the service and in all respects ready to receive cargo as soon as possible after delivery to the Owners under the Memorandum of Agreement of even date herewith between Owners and Probo Gull Inc.

The Owners to give Charterers minimum 3 days delivery notice.

The vessel shall be delivered with bunkers as on board, it being understood that the bunkers belong to the Charterers.

The vessel shall be redelivered with bunkers as on board, however minimum 500 mt. Owners shall pay for bunkers on redelivery at Charterers' last invoice prices.

Charterers shall give Owners months, followed by 20/15/10 days approximate and five days definite notice of

**Clause 62:**   The vessel shall not be ordered to nor bound to enter any ice bound port or place where lights, lightships marks and buoys are or are likely to be withdrawn by reason of ice on the vessel's arrival, or where there is a risk that the vessel will not be able on account of ice to reach the port or place or to depart after completing loading or discharging. If on account of ice the Master considers it dangerous to remain at the loading or discharging port or place for fear of the vessel being frozen in and/or damaged, he shall have the liberty to sail to a convenient open port or place and await Charterers' instructions. Any time lost through any of the foregoing causes on account of the vessel being frozen in and all delays in loading/discharging operations due to low temperatures shall be for Charterers' account. The vessel shall not be obliged to force ice, but to follow icebreaker and/or trade in broken up lanes always at Master's discretion with regard to the vessel's safety. In the event that the vessel sustains damage caused by ice and such damage could not reasonably have been avoided by the vessel's Master or crew, Charterers shall, without prejudice to the other terms and conditions of this Charter Party, reimburse the Owners for the cost for repairing such damage, but limited to the deductible under Owners' insurance and excluding normal wear and tear from operations in ice. Any time used for repairing such damage to count as hire.

**Clause 63:**   Throughout the period of the this Time Charter, the vessel to be in possession of all necessary valid equipment and certificates to comply with safety and health regulations, national and international regulations, and all current customary equirements, at all ports. If stevedores, longshoremen or other workmen are not permitted to work   due to failure of Master or   Owners   to   comply   with aforementioned regulations or because the vessel is not in possession of such valid and up-to-date certificates, then Charterers may suspend hire for the thereby lost.

**Clause 64:**   Any delay, expenses fines incurred on account of smuggling, if caused by the officers, and/or crew to be for Owners' account, or if caused by the Charterers' supercargo and/or staff or agents, for Charterers' account.

**Clause 65:**   Owners shall provide and keep valid deratization   and   fumigation   certificates throughout the charter period. Fumigations ordered because of cargo carried or ports visited while vessel is employed under this Charter Party shall be for Charterers' account.   Fumigations ordered because illness or the crew to be for Owners' account.

**Clause 66:**   The Owners shall at all times an their expense insure and keep the vessel against marine and war risks, insured value of the vessel is USD 22 million.

Charterers to have the benefit of any return insurance premium receivable by Owners from Underwriters (as and when received) by the reason of the vessel being in port for a minimum of 30 (thirty) days, provided the vessel is on-hire during such period.

If Charterers are co-insured under Owners' P&I coverage, Charterers shall cover any extra expense incurred through this.

Any deductibles payable under the legal defence cover taken out in accordance with Clause 12 of the Pool Participation Agreement to be for Charterers' account if the case in question has, been initiated by Charterers.

Clause 67:    Vessel to be left in safe seaworthy trim between ports/berths to Master's satisfaction.

Clause 68:    Charterers have the privilege of flying their house flag, and to paint their marks on the    vessel's    superstructure. The    cost    of such painting and removal and/or repainting to be for Charterers' account and in Charterers' time.

Clause 69:    If the vessel or Owners shall suffer any loss or damage which would have been recoverable under any applicable sub-charter had Owners been a party thereto in place of Charterers, then notwithstanding any other provision of this Charter Party, Owners shall be indemnified by Charterers in respect of such loss or damage to the extent, and no further that Charterers are entitled to recover under the said sub-charter.

Clause 70:    U.S.A. -P AND I CLUB/OIL POLLUTION INSURANCE

The vessel shall be entered with a P and I club belonging to the international group of P& I clubs and Owners warrant that they have and will maintain throughout the period of this Charter;

A.  The standard oil pollution insurance cover (currently USD 1.000 million) available from their P and I Club and

B.  Any additional oil pollution insurance cover which becomes available via their P and I Club.

At any time on or subsequent to the fixture date of this Charter, the Owners, upon Charterers' request, shall furnish to Charterers or their representative proof satisfactory to Charterers of such insurance.

Clause 71:    USA -OPA-90

Owners warrant:

a) that save in relation to incidents described as an "average most probable discharge" in navigation and vessel inspection circular no. 33 CFR part 155, subpart D. VRP, vessel and Owners have lodged vessel response plan which conforms with requirements of the OPA 90 and the above circular. Notwithstanding anything else contained herein, the vessel shall not be required to discharge at any facility (as defined in OPA at any other place or to any other vessel within the U.S. exclusive economic zone (as defined in OPA 90) which does not meet the requirements of OPA 90 and Government Regulations issued thereunder, including the above circular, and any changes or supplements to any of the aforesaid which deal with the occurrence of average most probable discharge, including the obligation to file, implement and obtain approval from the USCG of the relevant VRP.

b) that the VRP is approved and the vessel is operated in compliance therewith, when and as required by the VRP requirements;

c) that the Owner or operator of the vessel, and the vessel fully meets all other requirements of OPA-90 and any Government Regulations or guidelines issued thereunder.

This clause does not in any way lessen the overall effect or relieve the Owners of any State obligations in respect of Vessel Response Plans or other pollution requirements.

### Clause 72:    ITOPF CLAUSE

Owners warrant that throughout the duration of this Charter Party will be:

(1) Owned or demise chartered by a member of the "International Tanker Owners Pollution Federation Limited" and

(2) Entered in the Protection and Indemnity (P and I) Club stated in the vessel's description in this Charter Party.

### Clause 73:    ISM CLAUSE

The requirements of the International Safety Management (ISM) Code are hereby incorporated into this Charter. Owners warrant that a Safety Management System (SMS) in accordance with the ISM Code will be in operation both on shore and on board the vessel. Owners further warrant that at all times during the performance of this Charter; the vessel shall strictly adhere to and conform to the requirements of the ISM Code and shall be in possession of a valid Safety Management Certificate (SMC). Owners further warrant that at all times during the performance of this Charter Owners (or the "Company" as defined by the ISM Code) shall comply with the provisions of the ISM Code and be in possession of a valid Document of Compliance (DOC). Owners shall provide Charterers with copies of the SMC and DOC.

Any time lost due to non-compliance or lack of valid SMC or DOC shall be treated as off-hire and any costs, liabilities or expenses incurred thereby shall be for Owners' account.

### Clause 74:    Deleted

### Clause 75:    Charterers shall have the option to use the vessel in floating storage service for periods in excess of 4 months, products stored always in accordance with the vessel's technical specification and tank lining manufacturer's resistance guide. Any savings which the Owners should make (or reasonably should have made) by virtue of such service, shall be credited in the same manner as for lay-up savings in clause 56. As circumstances warrant, after any storage service Charterers shall arrange for under water cleaning of vessel's hull and propeller at their time and expense so that the vessel may resume service speed(s).

### Clause 76:    The vessel's crew is to perform sweeping (squeegeeing) of the vessel's tanks when required by Charterers. The Charterers will pay for this work at the rate of lumpsum USD 500 per tank.



The crew will be compensated for hold cleaning in accordance with Bulkhandling Rules and Practices. It is, however, agreed that the crew will be paid USD 500 per hold for cleaning after sulphur and potash.

Clause 77:    The Charterers may appoint one supercargo to accompany the vessel and he shall be accommodated and provided for at the Captain's table. The supercargo shall assist in an advisory capacity only. Any personnel designated by Charterers shall have access to all parts of the vessel at any time at sea or in port, provided Owners have been timely notified in writing. Access by such personnel shall be for the purpose of observation and inspection so long as this does not interfere with the vessel's operation. It is understood that Charterers' are always sailing with the vessel at Charterers' own risk and shall sign Owners standard (as per P&I wording) prior to boarding the vessel. Charterers undertake to take out insurance covering the supercargo's stay on board the vessel.

Clause 78:    Prior to hirepayment Charterers shall submit a full hire statement with any deductions as per 1, 2, and 3 below with description of these deductions:

1. Amounts disbursed on Owners' behalf.

2. Amounts relating to off-hire or estimated off-hire;

3. Any other amounts disbursed on Owners' behalf.

Owners shall be provided with documented accounts, including supporting vouchers to evidence all deductions made as and when they become available.

All communications and entertaining made by vessel on Charterers' behalf shall be for Charterers' account. Charterers will pay for same together with the next hire due C/V/E USD 1.500.

Any taxes and/or dues or charges for flag waiver levied by any government other than that of Owners' domicile or the ship's flag in respect of the earnings of the vessel whilst under this charter shall be for Charterers' account.

Clause 79:    Charterers. Sub-charterers or Suppliers shall in due time give proper handling instructions to the Master with regard to treatment of cargo if special instructions are deemed necessary. This does not, however, relieve the Master from his responsibility to collect information about handling/carriage as per IMO regulations.

Clause 80:    Owners shall pay for all garbage removal related to the vessel, whereas all removal from cargo tanks of sludges scale and sediment, disposal of tank washings and reception charges of slops shall be for Charterers account, provided same are related to cargo operations.

Clause 81:    Owners shall have the right to sell the vessel during the charter period, subject to this charter and subject to Charterers' approval, which shall not be unreasonably withheld.

Clause 82:    Nothwithstanding the Charter provisions in respect of English Law, General Average / Arbitration to be held in London

## CARGO LIQUID

Clause 83:    The vessel to be able to carry liquid cargoes in accordance with vessel's class and
Cargo Resistance Guide from Coating Manufacturers and Manufactures of Coating
Seals including but not limited to:

- Clean Petroleum Products

- Dirty Petroleum Products and crude. No trade to/from USA or US territories. If
vessel trades with Crude and/or DPP, last 3 cargoes prior to redelivery shall be CPP
uni und 2.5 opa.

- Caustic soda, about 50%

- Molasses

- Vegoils and tallow with up to 10 FFA

- Easy chemicals and liquid urea

The vessel shall comply with the IMO Chemical Code for the Carriage of Liquid
Caustic Soda.

In special cases, Charterers may ask for Owners' consent to carry excluded cargoes
or cargoes to excluded areas and such consent shall not be unreasonably withheld.

Clause 84:    Owners warrant that, subject to reasonable time and opportunity to inspect, they
will maintain all major oil company approvals in effect when the management
agreement with International Tanker Management Norway A.S. is terminated and
undertake to arrange for approval of the vessel by as many other major oil
companies as possible. Always subject that the vessel's age and type (Probo) in
principle will not prohibit such inspections. If at any time throughout this time
Charter, the Vessel offered for employment to a Major Oil company or for carriage
of a Major Oil cargo and the Vessel is denied by the Major Oil company, although
approved by this particular Major Oil company Owners shall not be held
responsible for such denial. In the event that Vessel turned to wet mode after a
prolonged period of trading at dry mode whereby Major Oil approvals may be
expired, Owners to have a grace period of 2 months for obtaining such expired
approvals provided Vessel's trading is giving Owners the opportunity to inspect. ARRAHGE SPECIAL INSPECTION

The Owners shall always, but subject to Charterers' trade of the vessel maintain in
the SIRE system two inspection reports not older than six months, available to oil
companies, traders etc. for vetting purposes.

The Owners will arrange CDI inspection minimum every 12 months.

Clause 85:    The vessel shall be capable of discharging in two (2) sequences, a full homogenous
liquid cargo with a specific gravity of 0.6 – 1.0 within 15 hours (excluding
stripping), maintaining at all times 100 PSI at ship's manifold, provided shore
facilities are capable of receiving same. Time for possible COW is not included.
Owners warrant that during discharge the vessel will use her pumping capacity to
Charterers' advantage, but operating to any flowrate or back pressure restrictions
advised by the shore.

The vessel shall be capable of heating a full crude oil cargo from 44°C to 66°C within 4 days during the voyage, with an average water temperature of not less than 5°C and an average air temperature of not less than 2°C.

The vessel shall be capable of cleaning one cargo hold at a time with hold water (max 80°C) using 2 guns.

Clause 86: The vessel's slop-tanks, when free of slops, to be at Charterers' disposal for carriage of cargo. Time and expense used for disposal of a normal quantity of slops/tank-washings to be for Charterers' account and likewise any compensation made by the receivers of slops to be credited Charterers.

Clause 87: Crew to connect and disconnect hoses provided same requested by shore installation and shore labours' union and/or port authority permit.

Clause 88: Vessel will not be placed in designated molasses trade with Queensland or similar molasses for any length of time. Trading molasses with intermediate voyages with caustic or other cargoes in between not to be considered designated molasses trade.

Clause 89: Annual COFR costs to be for Owners' account. However, if there should be an excessive increase in such costs resulting in a corresponding and general increase in rates for voyages for which COFR is required. Owners shall be compensated accordingly.

Extra insurance/OPA/OSRO fee for calling USWC/Canada or any other destinations where such extra insurance or fees may become required shall be for Charterers' account.

## CARGO DRY

Clause 90: The vessel shall be employed in carrying all lawful and harmless merchandise in accordance with vessel's IMO class and vessel's stability.

The vessel shall meet all relevant recommendations and requirements for the carriage of Direct Reduced Iron (DRI) in bulk.

In special cases, Charterers may ask for Owners' consent to carry excluded cargoes or cargoes to excluded areas and such consent shall not be unreasonably withheld.

Unless Owners' prior permission is obtained (such permission shall not be unreasonably withheld), the following cargoes shall be excluded:

1. Live stocks, arms, ammunition, explosives, acids, pond coals, sponge iron, nuclear or radioactive materials, asphalt, shavings, cotton, sun flower seed expellers, copra, meat bone meal, hides, silicon, bulk borax, salt pitch, ammonium hydro chloride, calcium carbide, creosoted goods, fishmeal, bitumen, used rails, dichloropenol, Niger seeds, metal sulphides, asbestos, salt rock, sulphur, West logs, tar, motor blocks and metal turnings, borings, heavy lift with weight exceeding vessel's gear capacity and all cargoes which might damage the integrity of the vessel.

2. All chemically hazardous materials of all classes as listed in IMO's Code of Safe Practice for Solid Bulk Cargoes unless the materials conform with the requirements of IMO and the initial design of the vessel conform with the specific requirements of IMO, related authorities and the vessel is approved by the classification society for carrying these materials.

The Owners might agree to carry chemically hazardous cargoes outside of the scope described above. In such case, the cost for complying with regulations of IMO, national and international authorities involved shall be for Charterers' account unless otherwise agreed.

3. Cargoes which may liquefy and/or which due to the appearance or condition is found not fit for safe shipment.

~~Charterers are allowed to carry maximum three cargoes of HMS 1+2 or shredded scrap per year (whether as full or part cargo) on the following conditions:~~

~~A) The scrap mentioned herein only limited to HMS 1+2 or specially excluded motor blocks and turnings and also metal borings and cuttings.~~

~~B) Charterers undertake that loading of first layer of scrap to be lowered as close as possible to tanktop and not to be dumped/dropped during loading. — First layer of scrap to be loaded at the height and to be evenly stowed/trimmed to the satisfaction of Master before loading balance cargo.——~~

~~C) Charterers undertake to supply on board, at their own expenses, of dunnage and/or other materials which Master considers necessary to provide safe protection from damage by loading scrap, but not to the ——~~

~~D) Such cargo not to be the first cargo after delivery or the last cargo prior to redelivery.——~~

~~E) Prior to loading, hold conditions survey to be conducted by an independent surveyor at Charterers' time/expenses and same to be done immediately after completion of discharge. In case of any damage to the vessel's holds and Australia hold ladders and any other part pieces of the vessel caused by loading such cargo, Charterers to be responsible for repairing all damaged parts/places to same condition as prior to loading of scrap before commencement of next voyage.~~

F) Any extra expenses resulting therefrom/incurred thereby (such as holds cleaning etc.) and any detention through any of above causes to be for Charterers' account.

Charterers shall be responsible for any damages directly related to lime removal as ascertained by mutually appointed coating expert. Further regulations regarding allowed and excluded cargoes are found in the Bulkhandling Rules and Practices.

Clause 91:   Vessel to be suitable for grab discharge in all holds and no cargo to be loaded in places inaccessible to grabs. Owners to provide experienced crane drivers for all cranes when required by Charterers, free of charge to Charterers and always subject to local rules and regulations. ~~Self-load/discharge operations to comply with "Rules and Practices" in Appendix 2 which to be binding on Owners.~~

Clause 92:    Stevedores to be appointed and paid for by the Charterers but are to work under the supervision of the Master. Owners to settle any stevedores damage to the Vessel or her fittings/equipment directly with stevedores if possible, but in case Owners do not succeed in obtaining settlement from stevedores damages provided that: Master shall exert his best efforts to hold party causing damage responsible in writing and obtain their written acknowledgement of responsibility if possible. Master to notify Charterers or their Agents in writing or by cable/telex with full details of stevedores damage within 24 hrs of occurrence, and in any case latest upon Vessel's departure from the location concerned, except in cases of hidden damages which to be reported as soon as discovered, but any case latest at the end of the voyage concerned. In case more than superficial damage caused to the Vessel, Owners to inquire with Charterers as to whether a survey by independent surveyor to be carried out prior to Vessel's departure if situation allows Owners to submit evidence showing ; How matter has been pursued directly with stevedores. Actual repair costs, settlement of stevedore damages between Owners and stevedores only to be based on actual repair cost unless otherwise agreed.

The Charterers have the right to redeliver the Vessel without repairing the stevedores damage for which Charterers are responsible incurred during the currency of this Charter Party as long as the damage does not affect the Class and/or seaworthiness or cargo worthiness of the Vessel or its immediate workability. However the Charterers undertake to reimburse the cost of repairs against the production of repair bills from the repairers which is, however, to be in conformity with the off-hire surveyor's report in respect to the extent of such damage unless otherwise agreed.

In case the stevedores' damage affects Vessel's Class and/or seaworthiness or cargo worthiness or its immediate workability, then such damage to be repaired prior to sailing from the port of occurrence at Charterers' time and expense to Class surveyors satisfaction.

Clause 93:    Hatch coamings, hatch covers and all other openings to be watertight. Charterers/Charterers' surveyor may at their discretion request a hose test of hatch coamings, hatch covers and all openings prior loading, and crew to perform such test under the supervision of Charterers/Charterers' surveyor.

Clause 94:    In the event of sulphur salt being loaded, lime washing of holds shall be for Charterers account and time.

Clause 95:    Deck cargo shall always be carried at Charterers' risk and expense, including lashing and securing. The Owners are to be and are hereby indemnified by the Charterers for any loss and/or damage liability caused to the vessel as a result of the carriage of deck cargo. Charterers shall pay: USD 1500 for top lashing and USD 500 for place of hog-lashing and USD 500 for removal of top lashing and USD 500 for removal of hog-lashing and USD 500 to place wooden stanches and USD 500 for re-lashing total deck load.

Clause 96:    U.S. Customs 24 hours and AMS rule clause.

(a) If loading cargo destined for the US or passing through US ports in transit, the Charterers shall:

     i)   Provide all necessary information, upon request from the Owners, to the Owners and/or their agents to enable them to submit a timely and

accurate cargo declaration directly to the US Customs in particular so that Owners may comply with any AMS (Automated Manifest System) requirement as applicable to this Vessel or,

ii) If permitted by US Customs Regulations (19 CFR 4.7) or any subsequent amendments thereto, submit a cargo declaration directly to the US Customs and provide the Owners with a copy thereof.

Where applicable to the Vessel (as determined by US Customs Regulations) the cargo declaration must be submitted to the US Customs latest 24 hours in advance of loading.

Where applicable to the Vessel (as determined by US Customs Regulations) the cargo declaration must be submitted latest 24 hours before arrival at the first US port.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with the provisions of sub-clause (a).

(c) If the Vessel is detained, attached, seized or arrested as a result of Charterers' failure to comply with the provisions of sub-clause (a), the Charterers shall provide a bond or other security to ensure the prompt release of the Vessel. Notwithstanding any other provisions in this Charter Party to the contrary, the Vessel shall remain on hire.

(d) Charterers shall, upon request from Owners, provide, in advance funds to enable Owners to post within good time an International Carrier's bond as required by US Customs regulations.

(e) Costs associated with the filling of the cargo manifest either through a service centre or by direct connection from the Owners and/or their agents to the CBP, to be for Charterers' account and payable with the next hire against supporting documentation.

Clause 97:    ISPS Clause for Time Charter Parties

(a)    (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b)    (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO

and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c)    Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d)    If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

For and on behalf of Owners

ń, CHALKIAS
Attorney-In-Fact

For and on behalf of Charterers

Second Original

## ADDENDUM NO 1

### Between

### PROBO BISON SHIPPING INC., Marshall Islands as Owners

and

### COMBINED CARGO UAE L.L.C., Abu Dhabi, UAE as Charterers

to

### Charter Party dated 21st of May 2004

It is hereby declared that the Charterers have renamed their company to the new name of Emirates Ship Investment Company LLC. It is therefore hereby agreed to amend the name of Charterers in the above mentioned charter party to the new name.

Line 4: Replace "Combined Cargo UAE LLC" with "Emirates Ship Investment Company LLC".

All other terms and conditions contained in the Charter Party shall remain in full effect.

In witness whereof the parties hereto have caused this Addendum No.1 to be executed on.

### Abu Dhabi, 3rd March 2005

For and on behalf of
PROBO BISON SHIPPING INC.
(OWNERS)

George Papathanassiou
Attorney in Fact

For and on behalf of
COMBINED CARGO UAE LLC
(CHARTERERS)

Harald Lone
General Manager

# EXHIBIT 2

## Kostas Liopyris

| | |
|---|---|
| From: | Alan.Ong@glencore.com.sg |
| Sent: | 10 May 2006 09:32 |
| To: | PRONXXI%GLLDNADR@glenctra.com.sg |
| Cc: | Kostas Liopyris |
| Subject: | Probo bison - tank cleaning to caustic soda |

ViewedBy:    Kostas Liopyris

Please guarentee that caustic soda will have less than 5 ppm of iron ore
residue after tank cleaning as proposed by master.

BEST REGARDS
ALAN ONG
TEL : +65 6415 7678
MOB : +65 9826 6368
FAX : +44 207 412 3498 / +65 6235 7219
TLX : 264136
EML : operations@st-shipping.co.uk / alan.ong@glencore.com.sg

1

## Kostas Liopyris

| | |
|---|---|
| From: | Kostas Liopyris |
| Sent: | 10 May 2006 10:53 |
| To: | 'Alan.Ong@glencore.com.sg' |
| Subject: | RE: Probo bison - tank cleaning to caustic soda |

ViewedBy:     Kostas Liopyris



cargoes_history.do
c

Alan, good afternoon

Further yrs below and our telecom please be advised that we have experience from same and/or similar cargoes and after the proposed holds cleaning we faced no problems with the loaded caustic soda.

Best Regards
Capt Kostas Liopyris
Prime Marine Management Inc
4 Possidonos Avenue
175 74 Kalithea Athens Greece
Tel : +30 210 94 64 817
Fax   +30 210 94 64 800
Mob : +30 6937 400 581
Mob : +30 6944 24 14 09
Email : mail@prime-marine.net

-----Original Message-----
From: Alan.Ong@glencore.com.sg [mailto:Alan.Ong@glencore.com.sg]
Sent: Wednesday, May 10, 2006 9:32 AM
To: PRONXXI%GLLDNADR@glencore.com.sg
Cc: Kostas Liopyris
Subject: Probo bison - tank cleaning to caustic soda

Please guarantee that caustic soda will have less than 5 ppm of iron ore
residue after tank cleaning as proposed by master.

BEST REGARDS
ALAN ONG
TEL : +65 6415 7676
MOB : +65 9826 6368
FAX : +44 207 412 3498 / +65 6235 7219
TLX : 264136
EML : operations@st-shipping.co.uk / alan.ong@glencore.com.sg

1

| LAST CARGO | CARGO LOADED |
|---|---|
| Manganese Ore | Caustic Soda |
| Alumina | Caustic Soda |
| Coal | Caustic Soda |
| Iron Ore | Caustic Soda |

# EXHIBIT 3

## Facsimile



HILL DICKINSON
International

| | | |
|---|---|---|
| To | Emirates Shipping | 2 Defteras Merarchias Street Piraeus 185 35 Greece |
| Attention Of | Mr. Viswanath | Tel: +30 210 428 4770 |
| Your Reference | -- | Fax: +30 210 428 4777 |
| Fax Number | 00971 2 626 8661 | |
| From | Patrick   Hawkins   /   Natalie Jackson | |
| | | patrick.hawkins@hilldickinson.com |
| Our Reference | PHH/S46/17ks | |
| No. of Pages | 1 | Date: 10 December 2007 |
| Subject | M/T "PROBO BISON" - C/P DD. 21/05/04 | |

We write further to previous correspondence in relation to the above captioned vessel.

Owners hereby put you on notice under the Shelltime Charterparty Clause 41 and Clause 82 that they have appointed Mr. Alan Oakley as the Arbitrator in respect of their indemnity claim and all and any other disputes arising under the Charterparty. Mr. Oakley's details are:-

| | | |
|---|---|---|
| Mr. Alan P. Oakley | Tel    : | +44 1279 771-475. |
| Hoy's Farm | Fax    : | +44 1279 771-968. |
| Upwick Green | Email  : | apo@alanoakley.co.uk |
| Albury Ware Hertfordshire | | |
| SG112LD, United Kingdom | | |

Please note that you now have 14 calendar days within which to appoint your own Arbitrator and provide us with notice of the appointment failing which, we shall appoint Owners Arbitrator to act as sole Arbitrator.

We look forward to hearing from you.

Kind regards,

Hill Dickinson International
**Hill Dickinson International**

Confidentiality Notice

The information contained in this facsimile is confidential and intended for use only of the addressee. Any unauthorised dissemination or copying of this facsimile, and any use or disclosure of information contained in it, is strictly prohibited and may be illegal. Please let us know by telephone if this facsimile has been sent to you in error and return it to us by post, at our cost.

Hill Dickinson International is regulated by the Law Society of England and Wales. Address for service of documents: Irongate House, 22-30 Dukes Place, London EC3A 7HX